**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF**

**OHIO**

IN THE MATTER OF THE
SUBJECT VEHICLE
BEARING OH TAG PWN5915

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Sara Sellers, a Special Agent with Homeland Security Investigations, being duly

sworn, depose and state as follows:

**INTRODUCTION**

1.  I am a Special Agent (SA) of Homeland Security Investigations (HSI), assigned to the

Office of the Assistant Special Agent in Charge, Columbus, Ohio since December 2020. During my

tenure as a Special Agent, I have completed the Criminal Investigator Training Program (CITP) and

the Homeland Security Investigations Special Agent Training Program (HSISAT) at the Federal Law

Enforcement Training Center (FLETC) in Glynco, Georgia. During CITP and HSISAT I have received

training that included cybercrimes, sexual exploitation of minors, child sexual abuse material, and

the dark web. I am currently based out of the Franklin County Sheriff's Office Internet Crimes

Against Children (ICAC) Task Force investigating child exploitation and am responsible for

enforcing federal law in numerous counties in the Southern District of Ohio. Moreover, I am a federal

law enforcement officer who is engaged in enforcing federal criminal laws, including 18 U.S.C. §

2251, 2252, and 2252A, and I am authorized by law to request a criminal complaint and arrest

warrant.

1

2.  This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically described in **Attachment A** of this Affidavit, including the semi-truck cab belonging to Valley Transportation, operated by Christopher MCINTURF (the "SUBJECT PERSON"), bearing Ohio license plate PWN5915 (the "SUBJECT VEHICLE") and the content of any computers and electronic storage devices located in the SUBJECT VEHICLE for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251, 2252, and 2252A, which items are more specifically described in **Attachment B** of this Affidavit.

3.  The statements contained in this affidavit are based in part on information provided by U.S. federal law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, including foreign law enforcement agencies, information gathered from the service of administrative subpoenas; the results of physical surveillance conducted by law enforcement agents; independent investigation and analysis by law enforcement agents/analysts and computer forensic professionals; and my experience, training and background as a Special Agent.  Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view visual depictions of minors engaged in sexually explicit conduct) and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child sexual abuse material) are presently located in the SUBJECT VEHICLE.

2

## **STATUTORY AUTHORITY**

4.  As noted above, this investigation concerns alleged violations of the following:

a.  18 U.S.C. § 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

b.  18 U.S.C. § 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved  the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

c.  18 U.S.C. § 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or

distributing, or attempting or conspiring to receive or distribute, any child sexual abuse material or any material that contains child sexual abuse material, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

d.     18 U.S.C. § 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child sexual abuse material, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.  The following definitions apply to this Affidavit and Attachment B:

a.     "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

c.     "Child sexual abuse material," as defined in 18 U.S.C. § 2256(8), is any visual

4

depiction, including any photograph, film, video, picture, or computer or computer- generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct or the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. Child sexual abuse material is also referred to as "child sexual abuse material" or "CSAM."

d. "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

e. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

f. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related

5

communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h.  "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i.  "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way it works.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

j.  A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications.  For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services.  See S. Rep. No.

6

99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

k.      The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

m.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

n.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

7

o.      "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

p.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

q.      "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

r.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal- genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

s.      "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages or text messaging. The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

t.      A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

u.      "URL" is an abbreviation for Uniform Resource Locator and is another name for

8

a web address.  URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

v.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

w.      "Webcam," as used herein, refers to a video camera that attaches to a computer or that is built into a laptop or desktop screen.  It is widely used for video calling as well as to continuously monitor an activity and send it to a Web server for public or private viewing. Webcams generally have a microphone built into the unit or use the computer's microphone for audio.

## BACKGROUND OF THE INVESTIGATION

### *Overall Investigative Summary*

6.      The investigation, described more fully below, involves U.S.-based individuals who paid money to purchase CSAM over the internet.  In particular, undercover law enforcement agents have discovered a criminal enterprise engaged in the advertising and selling of CSAM through websites and an encrypted online chatting application.  Over the course of approximately two years, undercover law enforcement agents repeatedly purchased CSAM over the encrypted application from individuals referred to below as the "Sellers."

7.      Each time law enforcement purchased CSAM from a Seller, the Seller stated that

9

payment could be made through a variety of methods, including the payment applications CashApp and Stripe, and also using virtual currency. The Sellers also identified specific accounts or wallets to which payment could be sent in exchange for CSAM. These accounts and wallets that the Sellers specifically identified are referred to below as "CSAM Payment Accounts."

8. Law enforcement then obtained lists of all individuals who made payments to the CSAM Payment Accounts identified by the Sellers. As set forth below, one such individual is Christopher W. **MCINTURF** who resides at 105 West National Drive, Apt. 07, Newark, Ohio 43055. For the reasons set forth below, there is probable cause to believe that this individual purchased CSAM from one or more Sellers as part of the criminal scheme described in this Affidavit. In particular, there is probable cause to believe that this individual has, among other things:

- Sent payments to a CSAM Payment Account in an amount that corresponds to the advertised price of the CSAM

- Sent payments to more than one CSAM Payment Account identified by law enforcement

- Sent payments on more than one occasion to a CSAM Payment Account identified by law enforcement.

### *Law Enforcement's Discovery of Websites Advertising CSAM*

9. Beginning in September 2022, under cover law enforcement ("UCLE") observed URL links posted on different social media platforms, including Discord and X (formerly "Twitter"). The links included the text "/invite." These links redirected to different websites, each of which advertised the sale of CSAM. These websites were all publicly accessible and did not require any specific browser to access. UCLEs accessed a number of these website and determined that each website's layout and

10

structure was identical or nearly identical and each one displayed "sample" CSAM videos. For the purposes of this affidavit, these identical or near-identical websites are referred to as the "CSAM Websites."

10.     For example, on one of the CSAM Websites, UCLE observed a registration page that displayed a looping video depicting a montage of various scenes from CSAM videos showing the sexual abuse of children as young as one years old, including images of an adult inserting his erect penis into the vagina of a prepubescent child[2]. The registration page also included the text "teen leak age 5-17" and "register an accounts to get thousands of great teen and cp video." I know from my training and experience that "CP" refers to "child sexual abuse material." Each of the CSAM Websites contained a similar or identical registration page, as shown below.



11.     The registration page required a username and password of at least five characters before a user could proceed further into the CSAM Website. Once a user registered, he would be able to access a page that included a "free preview" section containing child sexual abuse material. The free preview section included the text, "this is just 1% of what we have scroll down to watch the video! If you want to

get more video you can invite others to access for free or buy instant access." The free preview section contained between ten (10) and twenty-five (25) videos that depicted the sexual abuse of prepubescent children. The videos varied between pages, but every documented page contained multiple videos of the sexual abuse of prepubescent children. For example, one video that was observed on over twenty of the pages was 35 seconds in length; and it showed an adult male masturbating over the face of a prepubescent child before the adult male ejaculated on the child's face and in her right eye.

12.     Each CSAM website's registration page advertised access to packages of CSAM. The websites offered these packages in different "tiers" for different sale prices.  The prices varied from website to website.  On one specific CSAM website, the packages were advertised for purchase prices of $10 (Tier 1), $20 (Tier 2), $35 (Tier 3 - 160 GB of content), $60 (Tier 4 - 1 TB of content), and $80 (Tier 5 - 4 TB of content). [1]  In lieu of paying, users could also obtain CSAM packages by sending "invitations" to other users or posting them publicly.  These "invitations" generally consisted of URL links to a CSAM website's registration page, as previously described.  The links usually included the text "/invite," just like the links UC observed.  The number of invitations necessary to obtain a CSAM package differed from website to website.  For example, on one website, the packages were advertised as available for invitations in the amounts of 4, 10, 20, 40, and 60, per the below image. I know from my training and experience that "tod" refers to CSAM content depicting toddlers.





*Law Enforcement's Interactions with CSAM Sellers over Encrypted Application A*

13. After being presented with a menu on a CSAM Website, UCLE clicked on the red "instant access" or "Buy Now" button and was redirected to a conversation on the chat application referred to here as "Encrypted Application A" and described further below. After entering Encrypted Application A,

13

UCLE was presented with another menu for the purchase of CSAM. According to this menu, the CSAM would be delivered through hyperlinks to the online file storage service MEGA, also described further below.  Two examples of CSAM menus sent to UCLE over Encrypted Application A are below:

```
1.
  40 GB teen MEGA all is 17- for 35$
( all age 12-17 ) with 3000+videos

2.
  1.6 TB teen MEGA age 5-17 for 60$
(contain teen, tod, mom and son, dad and daguhter,
incest, bro and sister, rap3 and much more)
(84000+ videos)

3.
  2 TB MEGA totally different from the1.6 TB one, for 80$
(All age 5-17, with highly clearer menu, contain more incest)
(93000+ videos)

I will give you MEGA link and password. And I will invite you to join VIP
 Group
I will keep updating new collection in my VIP GROUP

You can pay me with Skrill, Wise, Paypal, Cashapp, Credit Card or Crypto like BTC
Using Cryptocurrency like BTC to pay, you get 20% discount!!
Using Cryptocurrency like BTC to pay, you get 20% discount!!
```

14

14. During the course of the investigation, UCLE received similar CSAM menus from different user accounts over Encrypted Application A. The users of these accounts are referred to here as "Sellers." The prices sometimes differed from menu to menu and between different Sellers. UCLEs also observed some Sellers offering discounts or expressing willingness to negotiate the price of the CSAM packages.

### *Law Enforcement's Identification of the CSAM Payment Accounts*

15.     Each time a Seller presented UCLE with a CSAM menu, that Seller also provided different options that UCLE could use to make payment. These options included CashApp, Stripe, and virtual currency, all further described below. Once UCLE chose a form of payment, the Seller identified a particular account or virtual currency wallet to which payment should be made. Those accounts and wallets, each of which was explicitly identified by a Seller as a method of payment for CSAM packages, are referred to here as "CSAM Payment Accounts." For example, if UCLE told the Seller that he wished

15

to pay via CashApp, the Seller would then identify a particular CSAM

payment Account for CashApp. Once the UCLE made payment to the CSAM Payment Account and the

Seller verified this, the Seller would then send UCLE a hyperlink to a MEGA file storage account that

contained CSAM.

16.     Each time a UCLE made a purchase from a Seller on Encrypted Application A, the Seller

sent a MEGA link that contained thousands of images and videos depicting minors engaged in sexually

explicit conduct.

### Undercover Purchases of CSAM via CSAM Payment Accounts

17.     On November 20, 2022, UCLE purchased CSAM "tier 2" ("1.6 TB

teen MEGA age 5-17 … (contain teen, tod, mom and son, dad an daguhter, incest, bro and sister,

rap3 and much more) (84000+ videos)") from a Seller over Encrypted Application A.  UCLE opted to make

payment in virtual currency, and the Seller identified a virtual currency wallet to which the payment could

be sent. This virtual currency address is one of the CSAM Payment Accounts. UCLE made payment to

this CSAM Payment Account, and the Seller sent UCLE a MEGA link containing 151,895 files that were

1.62 TB in total size. The majority of the files depict minors engaging in sexually  explicit conduct,

including the following:

    a.  A video file running two minute and thirty-one second that depicts the exposed anus and

        vagina of what appears to be an infant. The infant appears to be approximately ten to

        eighteen months of age. The infant is lying on her back on what appears to be a bed.  An

        adult male stands over her and masturbates his penis in front of the naked infant before

        placing his erect penis in the infant's mouth and rubbing it against her vagina.

    b.  A video file running forty-seven seconds that depicts the exposed penis of what appears

16

to be a prepubescent child. The child appears to be approximately five to seven years of age.  This video shows a close-up of an adult man using his thumb and forefinger to masturbate the child's penis.

c.  A video file running one minute and eleven seconds that depicts the exposed anus and vagina of what appears to be a prepubescent child. The file title includes the terms "pedo" (short for "pedophile"), "childlover," and "pthc" (sort for "pre-teen hard core," which refers to prepubescent children being sexually penetrated).  The video shows the child lying on her back with an adult male standing over her.  The adult male places his erect penis in the child's hand, masturbates over the child, and then ejaculates on the child's stomach.

18.     On June 30, 2023, UCLE purchased CSAM "tier 1" ("40 GB cp MEGA all is 17-… (all age 12-17) with 3000+videos") from a Seller over Encrypted Application A. UCLE opted to make payment via CashApp, and the Seller identified a CashApp account to which the payment could be sent. This CashApp account is one of the CSAM Payment Accounts. UCLE made payment to this CSAM Payment Account, and the Seller sent UCLE multiple MEGA links containing 3,266 files that were 39.1 GB in total size. The majority of the files depict minors engaging in sexually explicit conduct, including the following:

a.  A video file running forty-five seconds that depicts the exposed genitals of a prepubescent female child. The child appears to be approximately four to six years of age. The video shows the child on a bed lying on her back completely nude from the waist down. A naked pubescent male moves the camera angle from the child's face to her pelvic area. The male then inserts his erect penis in the child's anus, removes it, and

17

refocuses the camera on the child's vagina and anus.

19. On October 19, 2023, UCLE purchased CSAM tier 5 ("All of the above plus 4tb of teen and cp content ages 3-17 + VIP group access") from a Seller over Encrypted Application A. UCLE opted to make payment via Stripe, and the Seller identified a Stripe account to which the payment could be sent. This Stripe account is one of the CSAM Payment Accounts. UCLE made payment to this CSAM Payment Account, and the Seller sent UCLE multiple MEGA links containing 186,492 files that were 2.41 TB in total size. The majority of the files depicted minors engaging in sexually explicit conduct, including the following:

   a. A video file running five minute and eighteen seconds that depicts what appeared to be a sleeping child who appears to be approximately five to seven years of age. The file title includes the term "pthc." The video starts by showing a piece of paper with the written words "KIDSSUCK" and "[girl's name] SLEEP." The video then shows what appeared to be an adult male masturbating next to the sleeping prepubescent child. The child is clothed, the adult male presses his penis against the child mouth, and he masturbates before ejaculating on the child's face. The child appears to remain asleep throughout the video.

   b. A video file running two minute and one second that depicts the exposed vagina and anus of what appears to be a prepubescent girl. The child appears to be approximately four to six years of age. The child is lying on her back wearing a pink shirt and blue socks, and an adult male repeatedly inserts his penis into the child's anus and inserts a phallic object into the child's vagina.

   c. A video file running one minute and seven seconds that depicts an adult male inserting

18

his penis into the anus of what appeared to be a prepubescent girl. The child appears to be approximately five to seven years of age.

20.     Undercover law enforcement agents purchased CSAM from Sellers in the manner described above at least fourteen separate times over a two-year period. Each time, law enforcement interacted with a Seller over Encrypted Application A.  Each time, the Seller provided a menu of CSAM. Each time, law enforcement agreed to purchase CSAM and specified a form of payment, and the Seller then identified a CSAM Payment Account to which payment could be sent. Each time law enforcement sent payment to a CSAM Payment Account, the Seller sent a link to an online folder containing numerous videos depicting the sexual abuse of young children. In the course of making these purchases, law enforcement made payment to CSAM Payment Accounts using four different payment methods, including CashApp, Stripe, PayPal, and virtual currency. Law enforcement did not make payment to every CSAM Payment Account identified by the Sellers in the course of the investigation. Nevertheless, every time law enforcement did make payment to a CSAM Payment Account, the Seller provided CSAM in response. There is thus reason to believe that every CSAM Payment Account identified by a Seller is being or has been used to receive money paid in exchange for CSAM packages.

### *Further Investigation of the CSAM Payment Accounts*

21.     As noted above, law enforcement has identified the CSAM Payment Accounts— which consist of either virtual currency wallets or accounts at CashApp, Stripe, or PayPal—that are or have been used to accept payment as part of the criminal scheme described above. The CSAM Payment Accounts include at least nineteen CashApp accounts, at least four Stripe accounts, and at least nine virtual currency wallets.  Each of these CSAM Payment Accounts was explicitly identified by a Seller as an acceptable form of payment for CSAM.

22.     As part of the investigation into this criminal scheme, law enforcement identified the owners of some of the CSAM Payment Accounts with CashApp and Stripe.  For the most part, these individuals do not appear to be the same as the Sellers interacting with customers over Encrypted Application A.  Instead, the owners of the CSAM Payment Accounts largely allow their accounts to be used to receive proceeds from CSAM sales and pass them onto other parties.  These CSAM Payment Account owners are referred to here as "Money Mules."

23.     Specifically, law enforcement has interviewed at least eight Money Mules that owned CSAM Payment Accounts on CashApp and Stripe. During these interviews, the Money Mules  stated generally that they were contacted by other individuals who instructed them to (1) allow their CSAM Payment Accounts to be used to receive money, (2) later convert that money into virtual currency (minus a fee for the Money Mule), and (3) send that virtual currency to specified virtual currency wallets. At least one of the Money Mules appeared not to know that the money coming into their account was the proceeds of CSAM sales.

24.     Generally speaking, the identified Money Mules behind the CSAM Payment Accounts with CashApp and Stripe geographically separated, do not know each other, and appear to have no connections apart from their service as Money Mules in the criminal scheme described in this Affidavit. Thus, any innocent reasons an individual might have in sending payment to CSAM Purchase Accounts controlled by Money Mules across the country are significantly diminished.

25.     At the present time, law enforcement has arrested at least six individuals who purchased CSAM in the manner described above. Law enforcement identified these individuals as having made payments to CSAM Payment Accounts, some of which corresponded to prices listed in the CSAM "menus" detailed above.  Law enforcement discovered that each of these individuals did indeed receive

folders of child sexual abuse material from MEGA, consistent with the criminal scheme outlined above.

26.     During more than two years of investigation into the criminal scheme described above, every time an undercover law enforcement agent made a payment to a CSAM Payment Account—whether with CashApp, Stripe, or virtual currency—the Seller then sent the agent a link to child sexual abuse material files.

### *Identification of Christopher Willam MCINTURF as a Purchaser of Child sexual abuse material*

27. As part of this investigation, law enforcement sent legal process to CashApp, Stripe, and other organizations seeking lists of individuals who made payments to CSAM Payment Accounts. The CSAM Payment Accounts relevant to this investigation included the following:

   a.  CSAM Money Mule account **"Bomen"** was identified utilizing CashApp.

   b.  CSAM Money Mule account **"Beast"** was identified utilizing CashApp.

   Law enforcement reviewed the records provided by CashApp for Money Mule accounts **"Bomen"** and **"Beast"**. Law enforcement focused on time periods when they knew the CSAM Payment Account was receiving proceeds related to the criminal scheme described above.

28.  Law enforcement observed the CashApp account **"C_0newe0mbn"** had completed a transaction with Money Mule account **"Bomen"** on April 12, 2023. **C_0newe0mbn** made a transaction to CSAM Money Mule "**Bomen**" for thirty-five dollars ($35.00). This dollar amount matched one of the advertised CSAM tiers on the "CSAM menus" of Encrypted Application A documented above (CSAM depiction described in paragraph 18).

29. Law enforcement observed the CashApp account **"C_0newe0mbn"** had completed a transaction with Money Mule account **"Beast"** on September 03, 2023. **C_0newe0mbn** made a transaction to

CSAM Money Mule "**Beast**" for ninety dollars ($90). This dollar amount matched one of the advertised CSAM tiers on the "CSAM menus" of Encrypted Application A documented above (CSAM depiction described in paragraph 17).

30. I know based on my training and experience that customers of this criminal scheme often start with the lowest level tier on the menu and work their way up. Thus, increased payments over time, as occurred here, indicate they are receiving larger and more tailored packages of child sexual abuse material.

31. Law enforcement reviewed the account information related to the CashApp account "**C_0newe0mbn**". The records revealed that the name listed on the account of the CashApp account "**C_0newe0mbn**" under the section "Identity Verification Name" was Christopher **MCINTURF.**

32. The **CASHAPP** account "**C_0newe0mbn**" opened December 18, 2022, presented a date of birth of, 1969-05-09 which matches **MCINTURF'S** date of birth according to background checks conducted by law enforcement. The last four numbers of a social security number **"7517"** were also listed on the account, these are the same last four numbers of **MCINTURF's** social security number. The address listed on the account is **105 National Dr., Apt. 09, Newark, Ohio 43055. MCINTURF** currently resides at the same address, however, is registered to Apt. 07, according to Licking County's Sex Offender Registry Notification (SORN) database. The display name history shows the following display name also associated with the account: **"christopher7517".**

33. Additionally, Special Agents submitted an HSI Custom summons to Charter Communications Inc., requesting the subscriber information for the user associated with the IP address: 174.105.219.63, which was the IP address utilized by **MCINTURF** on April 12, 2023, during the $35 transaction with the CSAM Money Mule "**Bomen**". The return information included the Subscriber name:

22

Christopher **MCINTRUF**, Service Address: 105 W. National Dr Apt. 7, Newark, Ohio, 43055, and phone number: (740) 975-8875.

34. For the reasons articulated above, I submit there is probable cause to believe that **MCINTURF** is the individual who used one or more accounts to purchase packages of CSAM.

### *Criminal History*

35. According to The Court of Common Pleas located in Licking County, Ohio, on January 07, 2011, Christopher W. **MCINTURF,** was convicted of Rape (two counts) in violation of O.R.C Section 2907.02(A)(1)(b), felonies of the first degree; and Sexual Battery (two counts), a violation of O.R.C. Section 2907.03(A)(5), felonies of the third degree. **MCINTURF** was sentenced to three (3) years on count 1, three (3) years on count 2, two (2) years on count 3, and two years (2) on count 4. All counts were ordered to run consecutively for an aggregate sentence of ten (10) years. Additionally, **MCINTURF** was sentenced to a mandatory period of five years of post-release control following the imposed prison sentence.

36. **MCINTURF'S** original charges included Illegal Use of a Minor in Nudity Oriented Material (count 5), in violation of O.R.C. Section 2907.323(A)(2), a felony of the second degree. Count 5 was dismissed and **MCINTURF** plead guilty to the remaining 4 counts.

37. Accordingly, based on my training and experience and the information articulated herein, I submit that there is probable cause to believe that an individual residing at the SUBJECT PREMISES used their account to knowingly and intentionally receive visual depictions of minors engaged in sexually explicit conduct.

23

*Identification of SUBJECT VEHICLE*

38. A review of MCINTURF's Facebook page revealed several posts from January 2025, in which MCINTURF shared what appears to be the inside of a semi-truck cab and multiple pictures of the outside of a red semi-truck depicting "Valley Transportation", the visible USDOT (U.S. Department of Transportation number) "11534", and Ohio plate number "PWN5915". The company, according to their Facebook profile is based in Ashland, Ohio, which is located in the Northern District of Ohio. Further, MCINTURF's profile depicts "works at CDL Driver" from June 10, 2024, to present. CDL is a commonly used acronym for a "commercial driver's license". These licenses are required in the United States to operate a commercial vehicle and any passenger vehicle capable of holding more than fifteen (15) passengers.

39. On February 10, 2025, your affiant and HSI Task Force Officer Jacob Steinbrueck contacted Licking County Sheriff's Office Deputy Corey Love regarding MCINTURF's current work schedule and employment status. Deputy Love manages Licking County's Sex Offender Registration and Notification (SORN) database. Deputy Love confirmed MCINTURF currently works for a trucking company and is often not located in Ohio.

Detective Love contacted MCINTURF to ask when he would be in Licking County, MCINTURF stated he would return on February 21, 2025, as he intends to take the day off from work. Detective Love requested MCINTURF meet with him at Licking County Sheriff's to update his employment information.

40. On February 21, 2025, Special Agents met with Christopher MCINTURF at the Licking County Sheriff's Office. MCINTURF waived his rights and agreed to speak with Special Agents regarding the investigation. MCINTURF specified the location of CSAM on his devices and the current location of his commercial vehicle. MCINTURF confirmed he is a CDL driver for Vallery Transportation and that his truck is located in Ashland, Ohio, specifically at 1510 Township Road Ashland, Ohio. MCINTURF stated this was the address for Valley Transportation Inc., in Ashland, Ohio.

41. It is believed that the semi-truck, by its nature as a vehicle used for interstate transportation of goods, is being utilized to transport materials related to child exploitation, including but not limited to [items such as electronic devices, digital media, documents, or other physical evidence]. Given the ongoing nature of the alleged criminal activity and the mobile nature of the suspect's operations, there is reason to believe that evidence of child exploitation will be found in the semi-truck. The truck may contain digital devices, storage media, and other physical evidence related to child exploitation, including evidence that may be concealed within hidden compartments, containers, or other secure areas within the truck.

42. Based on the information and evidence presented herein, your affiant respectfully requests that the Court issue a search warrant authorizing the search of the interior and exterior of the SUBJECT VECHILE described above including compartments, or containers within the

25

truck, for the items included in Attachment B.

## **BACKGROUND ON MEGA**

43. MEGA is a cloud-based digital storage and file-hosting website based outside of the United States. An individual can access MEGA through the internet via a web browser or application

Installed on a compatible mobile device. Users can upload files to MEGA for the purpose of storing and/or backing up data, including image and video files. A MEGA user can organize data into file folders within the user's account.

    a. Data stored on MEGA is encrypted. To create and subsequently log into a MEGA account, a

user must provide an email address, which must be verified by "MEGA," and a unique password. The user's email address functions as the user's MEGA username. The size of storage of a MEGA account varies depending on if the account is free or what level of storage the account hold has paid for.

b. A MEGA user can share files or folders in a MEGA account by creating and sharing a link. The share feature is imbedded in MEGA and optional to all users. The MEGA user can choose to have the link password protected or not. Links can be created to share one file or folders containing hundreds of thousands of files. Once a link to a MEGA folder is sent the receiving party only needs an internet connection to view the shared files.

c. MEGA informs users that it does not condone, authorize, support, or facilitate the storage or sharing of child sexual abuse material. MEGA will disable or takedown such material, close the user's account and provide account details and other data to the appropriate authorities as it sees fit. MEGA is available to the general public for legitimate, non-criminal purposes, but investigation has revealed that some users engage in child sexual abuse material trafficking on MEGA by means of sharing hyperlinks to folders and files containing child sexual abuse material.

## BACKGROUND ON ENCRYPTED APPLICATION A

44. Encrypted Application A is a messaging application outside of the United States. An individual can access Encrypted Application A through an application installed on a compatible computer or mobile device. Encrypted Application A users can message and call other Encrypted Application A users, can create group conversations, and send photographs, videos, and other files to other Encrypted Application A users. Encrypted Application A also provides end-to-end encryption and

video calling, voice over Internet protocol, and file sharing, along with several other features. Users can choose to delete messages they have sent or received.  Users are able to delete messages for their device and the device they were communicating with.

45. Users can join Encrypted Application A by creating an account linked to a telephone number. Users can set up an account username which can be shared instead of telephone numbers. Encrypted Application A does not provide records to law enforcement, making it an attractive application to use for those who commit crimes.

## BACKGROUND ON CASHAPP

46. CashApp is a financial service application in the United States.  An individual can access CashApp through a web browser or through an application installed on a compatible mobile device.  Users can use CashApp to send and receive money.

   a. Data stored on CashApp is encrypted.  To create and subsequently log into an CashApp account, a user must provide an email address, which must be verified by CashApp, and a unique password.  The user creates a unique username which allows other users and businesses to search for them to request and receive funds.

   b. After users set up an account, they may link it to an existing bank account. Once the banking account is synced to their CashApp account, users can transfer funds to and from their linked account. Any funds that are received are stored in the CashApp balance account unless and until the user transfers it to a linked banking account.

   c. CashApp payments are instantly and immediately available after the transfer.

   d. CashApp can imposes a daily limit on funds being transferred, but users can choose to verify their accounts to have their limits increased.

28

e.  CashApp users have the option to decline transfers from other users. CashApp users also have the option to attach messages to any funds sent or requested.

## BACKGROUND ON STRIPE

f.  Stripe is a financial service based in the United States.  An individual can access Stripe through a web browser.  Users can use Stripe to process payments using most major Credit and Debit cards.

g.  Data stored on Stripe is encrypted.  The data collected by Stripe may include a hashed card number, name and address of the customer.  The accounts for Stripe are tied to websites that advertise sales online.  To make a Payment to Stripe a customer must be sent a link to a webpage, the customer then enters their credit or debit card details, and they payment is possessed by Stripe.

h.  After users make a payment using Stripe, the transaction will be recorded by the bank controlling the card that was used. The account holder that sets up the payment portal for Stripe can limit the data collected and provided to Stripe this data will include the hashed card number and expiration data of the credit or debit card used and can include the name or address tied to the card.

## BACKGROUND ON VIRTUAL CURRENCY

47. Bitcoin[3] or "BTC" is a type of virtual currency, circulated over the Internet. Bitcoin are not issued by any government, bank, or company, but rather are controlled through computer software operating via a decentralized, peer-to-peer network.  Bitcoin is just one of many varieties of virtual currency. Ethereum and Litecoin are other virtual currencies.

48. Bitcoin are sent to and received from Bitcoin "addresses."  A Bitcoin address is somewhat

analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each Bitcoin address is controlled through the use of a unique corresponding private key. This key is the equivalent of a password, or PIN, and is necessary to access the funds associated with a Bitcoin address.  Only the holder of an address' private key can authorize transfers of bitcoin from that address to other Bitcoin addresses.  Users can operate multiple Bitcoin addresses at any given time and may use a unique Bitcoin address for each and every transaction.

49. To acquire Bitcoin, a typical user purchases them from a virtual currency exchange.  A virtual currency exchange is a business that allows customers to trade virtual currencies for other forms of value, such as conventional fiat money (*e.g.*, U.S. dollars, Russian rubles, euros).  Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies).  Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information about their customers and verify their clients' identities.

50. To transfer bitcoin to another Bitcoin address, the sender transmits a transaction announcement, which is electronically signed with the sender's private key, across the peer-to- peer Bitcoin network.  To complete a transaction, a sender needs only the Bitcoin address of the receiving party and the sender's own private key.  This information on its own rarely reflects any identifying information about either the sender or the recipient.  As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a Bitcoin transaction itself.  Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain, a decentralized public ledger that records every Bitcoin transaction.  The blockchain

logs every Bitcoin address that has ever received bitcoin and maintains records of every transaction for each Bitcoin address.

51. While a Bitcoin address owner's identity is generally anonymous within the blockchain (unless the owner opts to make information about the owner's Bitcoin address publicly available), investigators can use the blockchain to identify the owner of a particular Bitcoin address. Because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to, among other recipients, Bitcoin exchangers. Because Bitcoin exchangers generally collect identifying information about their customers, as discussed above, subpoenas or other appropriate legal process submitted to exchangers can, in some instances, reveal the true identity of an individual responsible for a Bitcoin transaction.

## BACKGROUND ON CHILD SEXUAL ABUSE MATERIAL, COMPUTERS, AND THE INTERNET

52. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a. Computers and digital technology are the primary way in which individuals interested in child sexual abuse material interact with each other. Computers basically serve four functions in connection with child sexual abuse material: production, communication, distribution, and storage.

b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer using a cable or via wireless connections such as

"WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory

31

cards are often large enough to store thousands of high-resolution photographs or videos.

c.        A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world.  Child sexual abuse material can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.        The computer's ability to store images in digital form makes the computer itself an ideal repository for child sexual abuse material.  Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e.        The Internet affords individuals several different venues for obtaining, viewing, and trading child sexual abuse material in a relatively secure and anonymous fashion.

f.        Individuals also use online resources to retrieve and store child sexual

32

abuse material. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child sexual abuse material can be found on the user's computer, smartphone, or external media in most cases.

g.     A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child sexual abuse material, to interact directly with other like- minded offenders or with potential minor victims, and to access cloud-storage services where child sexual abuse material may be stored.

h.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or

ISP client software, among others). In addition to electronic communications, a

33

computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW CHILD SEXUAL ABUSE MATERIAL

53. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who access online child sexual abuse and exploitation material via a website:

i.  Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

j.  Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

k.  Likewise, such individuals often maintain their child sexual abuse material images In a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These child sexual abuse material images are often

34

maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child sexual abuse material images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child sexual abuse material on their computers or digital devices on a cyclical and repetitive basis.

l.          Importantly, evidence of such activity, including deleted child sexual abuse material, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[5]

m.          Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child sexual abuse material distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child sexual abuse material.

n.          Such individuals prefer not to be without their child sexual abuse material for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child sexual abuse material throughout the world.

54. Based on all of the information contained herein, I believe that an individual residing at the

SUBJECT PREMISES likely displays characteristics common to individuals who receive, or possess images of child pornography.  In particular, the target of the investigation used their account to purchase and download child pornography with the intent to view such material.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

55. As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT VEHICLE in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

56. I submit that if a computer or storage medium is found in the SUBJECT VEHICLE there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

      o.      Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      p.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so

because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

q.        Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

r.        Similarly,  files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

57. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT VEHICLE because:

s.        Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory

37

paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

t.        Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that

38

logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, Internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

u.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how

39

computers were used, the purpose of their use, who used them, and when.

v. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

w. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

x. I know that when an individual uses a computer to obtain or access child sexual abuse material, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved;

40

records of Internet discussions about the crime; and other records that indicate the nature of the offense.

58. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the target location it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search website all

of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not

41

scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

y.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

z.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a

"dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

59. Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers,

42

modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime.  This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

60. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**CONCLUSION**

61. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, will be found at the locations described in Attachments A. I respectfully request that this Court issue a search warrant for the locations described in Attachments A, authorizing the seizure and search of the items described in Attachment B.

62. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the TARGET VEHICLE. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

HSI Special Agent
Sara Sellers

Sworn to this 24<u>th</u> day of February 2025, via telephone or other reliable electronic means after submission by reliable electronic means.  Fed. R. Crim. P. 4.1 and 41(d)(3).

James E. Grimes Jr., United States Magistrate Judge

## ATTACHMENT A

### DESCRIPTION OF VEHICLE TO BE SEARCHED

A red semi-truck vehicle, bearing Ohio license plate number PWN5915 and "Valley Transportation" on the side of the vehicle, and any computers, cellphones or digital media located herein. A photo of the vehicle posted on Facebook by the SUBJECT PERSON is pictured below.



46

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. §§ 2252 and 2252A.

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

47

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

e. evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

48

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography, as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

    a. Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    b. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

    c. Records and information relating to sexual exploitation of children, including correspondence and communications between users of child pornography and exploitation websites.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

49

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro-SD cards, macro-SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.